UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WANGAVU MCCRAY,

      Plaintiff,

v.                                                           Case No: 6:23-cv-1567-JSS-RMN

FLORIDA GYPSUM, LLC, and
DELROS MANAGEMENT, INC.,

      Defendants.
_____/

## ORDER

Defendants move for summary judgment. (Dkt. 56; *see* Dkt. 61.) Plaintiff opposes the motion. (Dkt. 57.) Upon consideration, for the reasons outlined below, the court grants the motion.

## BACKGROUND

Defendants own Vatos, Inc., a drywall installation company. (Dkt. 56-1 at 15, 25.) As part of Vatos's operations, Defendants maintain offices in Jacksonville, Orlando, and Tampa. (*Id.* at 222.) Plaintiff was hired by Vatos as a field supervisor in 2013 and worked out of the Jacksonville division. (*See id.* at 14–15, 25; Dkt. 57-1 at 8.)

Hector Cerrillo hired Plaintiff and worked as his supervisor until late 2021. (Dkt. 56-1 at 159–60.) While Mr. Cerrillo testified to his fondness for Plaintiff, (*id.* at 168), he also testified that Plaintiff was consistently distracted from his work by

personal issues, (*id.* at 164). He testified that "there was always a problem" with Plaintiff and that Plaintiff shared his issues with others to such an extent that Mr. Cerrillo had to intervene, telling Plaintiff he was "bringing the morale down." (*Id.* at 180–81.)

Joel Parra became Plaintiff's direct supervisor in April 2021. (*See id.* at 160; Dkt. 61 at 56.) Daniel Delgado, who worked in human resources, (Dkt. 56-1 at 199), testified that Mr. Parra, who hailed from the Orlando division with "a solid reputation" and "above average" evaluations, was brought over to Jacksonville as a supervisor to help revitalize that division, (*id.* at 203), and to fill a vacancy created by Raul Rodriguez, who was leaving Vatos, (Dkt. 61 at 56). When Mr. Parra transferred to Jacksonville, he became Plaintiff's supervisor. (*Id.* at 18.) Luis Rodriguez, head of the Jacksonville division, (Dkt. 61 at 56), was Joel Parra's direct supervisor, (Dkt. 57-1 at 64).

Mr. Cerrillo testified that Plaintiff had previously suggested that Plaintiff did not get the supervisory position that Raul Rodriguez had been given because of Plaintiff's race. (Dkt. 56-1 at 178 (Mr. Cerrillo's testimony that Plaintiff said "something to the nature of, oh, man, am I not getting the position because I'm Black").) While Mr. Cerrillo testified that he did not recall Plaintiff specifically seeking a promotion when Raul Rodriguez left, he did testify that he did not believe Plaintiff was qualified for that position, stating that Plaintiff's "personal problems got in his way, way more than he thought." (*Id.* at 179.)

Plaintiff described his relationship with Mr. Parra as "stressful" because Mr. Parra "requested things from [him] . . . that were out of [his] control." (Dkt. 57-1 at 9.) Plaintiff testified that Mr. Parra "would get upset about the quality of some of" Plaintiff's work but that Plaintiff felt he was doing everything within his authority as a field supervisor. (*Id.* at 15.) He testified that all the issues with his work were caused by the subcontractors assigned to his homes. (*Id.* at 25–26.) Plaintiff further testified that he reported these issues to Mr. Parra but that Mr. Parra kept hiring the same subcontractors. (*Id.* at 16; *see id.* at 26–31.) Thus, in Plaintiff's view, the subcontractors were not performing quality work, causing the homebuilders to complain to Mr. Parra, who then held Plaintiff responsible. (*Id.* at 16.) Plaintiff testified that he "constantly requested that" one subcontractor in particular be removed from his projects for performing subpar work and Plaintiff "did [not] want [the subcontractor] to continue to make [Plaintiff's] work look bad." (Dkt. 56-1 at 52.)

However, Plaintiff also acknowledged that as a field supervisor, he was responsible for managing, monitoring, and evaluating subcontractors and that he was required to check each home "at every single stage" of the drywall installation process and would be "first and foremost the responsible party" for any "drywall defect." (*Id.* at 35, 39; *see id.* at 225–26 (outlining the responsibilities of field supervisors).) Mr. Parra similarly testified that field supervisors were required to address subcontractors' performance issues in the first instance and that he would then intervene to the extent the field supervisors could not resolve the issue. (Dkt. 57-1 at 64–65.) When asked how Plaintiff compared to the other field supervisors he managed, Mr. Parra stated

that Plaintiff "was[ not] performing to the task." (Dkt. 56-1 at 149.) Specifically, he felt that Plaintiff "should [have] be[en] in a position to help [him] more," because Plaintiff was the most experienced supervisor in Jacksonville and was accordingly assigned "the north route," which he stated was demanding. (*Id.* at 148–49.)

Mr. Parra testified that none of the subcontractors Vatos used in Jacksonville delivered quality work and that the field supervisors were therefore expected to intervene as needed to address issues that arose. (*See* Dkt. 57-1 at 99 ("[The subcontractors] were all the same. There was no quality. That [is] why we needed desperately for all the supervisors to be on top of them to check the quality of work, because they all needed supervision.").) Mr. Parra further testified that many of the subcontractors complained about Plaintiff, asserting that "[t]he materials were not arriving on time to the job site for them to perform their job." (*Id.* at 101.) Indeed, he stated that the majority of the complaints he received from both building supervisors and subcontractors regarding field supervisors "were about [Plaintiff]." (*Id.* at 102.) He also testified that builders' supervisors—in effect, Vatos's customers—would call him to say that they had communicated an issue to Plaintiff but the issue had not been corrected. (Dkt. 56-1 at 113.)

As supervisor of the Jacksonville division, Mr. Parra performed unannounced spot-checks on the field supervisors' in-progress homes. (*Id.* at 143.) He testified that "on many occasions" he would find that Plaintiff was not present at his jobsite. (*Id.*) Mr. Parra attributed Plaintiff's recurring issues to his "personal problems." (*Id.* at 110 ("When . . . you have problems at home, sometimes it reflects at work, and we don't

do our jobs as sufficiently."); *see also id.* at 112.)  According to Mr. Parra, while Plaintiff solved some problems on his own, he failed to address others that were within his control and occasionally would not highlight an issue at all, and Mr. Parra would not find out about the issue until a building supervisor brought it to his attention.  (*Id.* at 114–16.)

On May 11, 2022, Mr. Parra emailed Vatos's corporate office to report that Plaintiff had sent a subcontractor to a home without verifying whether the home was ready and that the subcontractor later returned only to find that Plaintiff had since sent a different subcontractor to do the work.  (*See* Dkt. 56-1 at 263; Dkt. 57-1 at 245.)[1]  He also stated that on a separate occasion, Plaintiff had requested a subcontractor to perform work on the wrong date and that when the mistake was discovered and the subcontractor given the correct date, the subcontractor was no longer available to work on the necessary date.  (Dkt. 56-1 at 263.)  Mr. Parra claimed that "[t]here ha[d] been innumerable instances" in which he and Luis Rodriguez had corrected Plaintiff in similar ways, but the mistakes kept happening.  (*Id.*)  Accordingly, he stated he had "decided to remove [Plaintiff's] bonus to be able to pay the people affected and also in part to see if [Plaintiff] react[ed] and pa[id] more attention."  (*Id.*)

---

[1] Mr. Parra wrote this email in Spanish, and Defendants have provided a translation into English rendered by Mr. Delgado.  (*See* Dkt. 56-1 at 222.)  Plaintiff does not assert that the translation is inaccurate or otherwise contest the court's reliance on it, and indeed, he elsewhere cites Mr. Delgado's translation.  (*See* Dkt. 57 at 18 (citing Dkt. 56-1 at 263).)  Thus, the court looks to Mr. Delgado's translation.

Plaintiff took a personal day on Friday, May 20, 2022, delegating his responsibilities to a coworker named Christian. (*See id.*; Dkt. 57-1 at 36.) He testified that when he returned to work the following Monday, Mr. Parra held him responsible for "problems that Christian was not able to handle." (Dkt. 57-1 at 37.) Plaintiff responded that "it was [Mr. Parra's] responsibility to help Christian to make sure that he did everything correctly," which, according to Plaintiff, prompted Mr. Parra to verbally suspend him because Mr. Parra "got upset" that Plaintiff made this comment during a "conversation in front of other supervisors." (*Id.*) Mr. Parra then filled out an employee disciplinary form dated May 23, 2022, indicating that Plaintiff was being disciplined for carelessness, tardiness, and work quality. (Dkt. 56-1 at 257.) He wrote that Plaintiff displayed a "[l]ack of attention," "[w]aste[d] materials, never d[id] his weekly report on time, [and] delayed jobs according to building supervisors." (*Id.*) He indicated that Plaintiff had been warned multiple times. (*See id.*) He also included the following brief statement:

> [Plaintiff] brought his personal problems to work. They've seen him at work with his son in the communities. The . . . technicians that work for him do whatever they want. I have reports that they've (customer[s]) see[n] . . . technicians sleeping in houses which he was told about but never took action. Houses with bad finishing and he sprays them anyway[].

(*Id.* at 257, 260.) In the space provided on the form for the decision rendered, Mr. Parra wrote that he "d[id not] want [Plaintiff] back," (*id.* at 258), though an email he sent on May 25, 2025, indicated only that Plaintiff was suspended without pay for one week, from May 23 to 30, 2025. (*See* Dkt. 57-1 at 230.)

Shortly after being suspended, Plaintiff emailed Mr. Delgado and Luis Rodriguez, among others, to complain about the suspension. (Dkt. 56-1 at 265.) He wrote that his "workload [wa]s overloaded" and that he felt "singled out" by Mr. Parra because other supervisors struggled with the same problems. (*Id.*) He also suggested that Mr. Parra provided differential treatment to others with whom he was friendly and that he "play[ed] favor[ites] with certain workers while other workers continue[d] to complain about not getting enough work." (*Id.*) He requested that "th[e] situation be looked into but not [f]rom a one-sided point of view." (*Id.*) Mr. Parra testified that he inspected Plaintiff's homes during Plaintiff's suspension. (*Id.* at 144–46.) According to him, while covering Plaintiff's homes, he found one that "was supposed to [have] be[en] finished two weeks prior" that had not been finished. (*Id.* at 145.)

Plaintiff testified that "the stress from what Mr. Parra was doing" caused him to "start[] getting bad migraine headaches and anxiety," which he described as "flareups from [his] injuries," apparently referencing injuries sustained in a past car accident. (*See id.* at 63, 80; Dkt. 57-1 at 41.) Plaintiff emailed Mr. Delgado and Mr. Parra a doctor's note from University of Florida (UF) Health Family Medicine on June 20, 2022, which stated, in its entirety, that "[Plaintiff] was seen in our office 6/20/22, and may return to work as of 6/27/22." (Dkt. 57-1 at 235–36.) Mr. Parra testified that he covered Plaintiff's route during his medical leave, this time observing that Plaintiff had not been properly cleaning his homes after they were sprayed and that he had left behind extra materials that needed to be moved to the next home. (Dkt. 56-1 at 146–47.) Mr. Parra testified that these observations led him to conclude

that Plaintiff was not properly supervising his homes. (*Id.* at 147.) He testified that he shared this conclusion with Luis Rodriguez, and told him that, "considering [Plaintiff's] 'experience' and the years that he[ had]" worked for Vatos, Plaintiff "should be in a position to help . . . more . . . but instead he had a lot of issues." (*Id.* at 148.)

Mr. Delgado testified that while Plaintiff was on medical leave, Luis Rodriguez requested that he look at Plaintiff's employee file for "previous performance issues" because he "was planning on terminating [Plaintiff] because of what was being exposed during . . . his leave of absence." (*Id.* at 209.) Mr. Delgado also provided a declaration that the decision to terminate Plaintiff was the result of Plaintiff's shortcomings, which "were leading to customer complaints and delayed timelines." (*Id.* at 219.) He also declared that Plaintiff "would leave jobsites during work hours" and bring his child to jobsites. (*Id.*) During his deposition, Mr. Delgado affirmed that these were the reasons for Plaintiff's termination. (*Id.* at 210.)

Plaintiff was terminated on June 27, 2022, the day he returned from his medical leave. (*See id.* at 208.) He testified that when he got to the office that day, Mr. Parra told him he was fired. (Dkt. 57-1 at 41.) When Plaintiff asked why, Mr. Parra simply said that the decision "c[a]me from the office." (*Id.*) Plaintiff left without inquiring further. (*Id.* at 41–42.)

Plaintiff filed his initial complaint on August 16, 2023. (Dkt. 1.) He subsequently filed an amended complaint, (Dkt. 13), and, with the court's permission, a second amended complaint, (Dkt. 17), which is the operative pleading. He asserts

claims of race discrimination and retaliation in violation of Title VII, 42 U.S.C. §§ 1981, 2000e-2(a), 2000e-3(a), (Counts I through IV), disability discrimination and retaliation in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213, (Counts V and VI), and interference in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601–2654, (Count VII). (*See* Dkt. 17 at 9–17.) He alleges that he has exhausted all of his administrative remedies, and Defendants provide no argument to the contrary. (*Id.* at 3–4; *see* Dkts. 56, 61.) He seeks compensatory damages and legal fees. (Dkt. 17 at 17.)

## APPLICABLE STANDARDS

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials" when resolving the motion. Fed. R. Civ. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record." (quotation omitted)).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record showing a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that no evidence supports the non-moving party's case, the burden then shifts to the non-moving party to show that there are, in fact, genuine factual disputes precluding judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir. 1999) ("The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." (quotation omitted)). Rather, the non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *see also HRCC*, 703 F. App'x at 816–17 ("Presenting arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." (alteration adopted) (quoting *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))). In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the non-moving

party and must resolve any reasonable doubts in that party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). The court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Summary judgment should be granted only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non[-]moving party." *Matsushita*, 475 U.S. at 587.

## ANALYSIS

The court considers Plaintiff's claims of discrimination, retaliation, and interference in turn.

### A. Race Discrimination

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of [his] race." 42 U.S.C. § 2000e-2(a)(1). Race discrimination claims under section 1981 are analyzed in the same manner. *See Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220 n.5 (11th Cir. 2019) (en banc). Plaintiff advances arguments under both *McDonnell Douglas*[2] and the convincing mosaic approach. The court briefly addresses the former before turning to the latter.

#### 1. *McDonnell Douglas*

"[T]he Supreme Court in *McDonnell Douglas* set out a burden[-]shifting framework designed to draw out the necessary evidence in employment discrimination

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

cases." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023). Under this framework, the burden is on the plaintiff first to "establish[] . . . a 'prima facie' case of discrimination" by showing, among other things, that his "employer treated 'similarly situated' employees outside h[is] class more favorably." *Id.* (quoting *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "The prima facie showing entitles the plaintiff to a rebuttable presumption of intentional discrimination," which the defendant may then rebut "by offering evidence of a valid, non[]discriminatory justification for the adverse employment action." *Id.* If the defendant is successful in rebutting the presumption of discrimination, the burden shifts back to the plaintiff to "show not only that the employer's justification was pretextual, but that the real reason for the employment action was discrimination." *Id.*

Defendants assert that Plaintiff has failed to satisfy the comparator requirement. (Dkt. 56 at 20.) This requirement imposes upon Plaintiff the burden of identifying a comparator with whom he was "similarly situated in all material respects." *Lewis*, 918 F.3d at 1217, 1229. Generally, a proper comparator will have "engaged in the same basic conduct as the plaintiff," "been subject to the same employment policy, guideline, or rule as the plaintiff," "been under the jurisdiction of the same supervisor as the plaintiff," "and share[d] the plaintiff's employment history." *Eliassaint v. RTG Furniture Corp.*, 551 F. Supp. 3d 1293, 1303 (M.D. Fla. 2021) (quoting *Lewis*, 918 F.3d at 1226, and then *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021)).

In his response, Plaintiff fails to identify any specific individuals as comparators; instead, he references "Hispanic counterparts" to whom Mr. Parra "provided consistent support and assistance" while "den[ying] Plaintiff the same." (Dkt. 57 at 12.) This reference is insufficient to satisfy Plaintiff's burden on this point, and as a result, he failed to establish a prima facie case of race discrimination under *McDonnell Douglas*. *See Piquion v. Walgreen Co.*, 369 F. Supp. 2d 1339, 1346 (S.D. Fla. 2005) (concluding that the plaintiff had not satisfied the comparator requirement where he "offer[ed] nothing more than conclusory statements that no other employee was treated the same way"); *LeBlanc v. TJX Cos.*, 214 F. Supp. 2d 1319, 1326 (S.D. Fla. 2002) (concluding that the plaintiff had not satisfied the comparator requirement where he "fail[ed] to indicate specific instances or individuals to support his assertions, relying solely on his conclusory allegations"). Because Plaintiff has failed to proffer a comparator with whom he was similarly situated in all material respects, he has failed to make out his prima facie case under *McDonnell Douglas*. *See Earle*, 843 F. App'x at 166 ("A plaintiff's failure to produce evidence showing that a single similarly situated employee was treated more favorably will preclude the establishment of a prima facie case.").

### 2. Pretext and the Convincing Mosaic

Even if Plaintiff had established his prima facie case, Defendants have provided legitimate, nondiscriminatory reasons for their actions, *see Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013), as the burden to do so is "exceedingly light," *Turnes v. Amsouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994) (quoting *Meeks v. Computer*

*Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)). Defendants have satisfied their burden for the adverse actions of which Plaintiff complains: namely, the revocation of his bonus, his suspension, and his termination. (*See* Dkt. 57 at 18.) When Mr. Parra revoked Plaintiff's bonus, he sent an email explaining that Plaintiff made two errors that Vatos then had to pay to remedy. (*See* Dkt. 56-1 at 263.) He also indicated in that email that he and Luis Rodriguez had spoken to Plaintiff about similar incidents "innumerable" times and that Plaintiff's bonus was being revoked "to see if [Plaintiff] react[ed] and pa[id] more attention." (*Id.*) Similarly, when Plaintiff was suspended, Mr. Parra executed an employee disciplinary form indicating that Plaintiff's work performance was the reason. (*Id.* at 257–58.) Mr. Parra also stated that Plaintiff "brought his personal problems to work," "[l]ack[ed] . . . attention in regards to bringing materials to hangers, finishers, and sprayers," "[w]asted materials," submitted regular reports late, and "delayed jobs according to builder supervisors." (*Id.* at 257.)

Mr. Parra testified that the decision to terminate Plaintiff was based on his observations made while covering Plaintiff's routes that Plaintiff was not adequately managing his jobsites. (*See id.* at 146–48.) He also provided a declaration that Plaintiff "struggled with [his] supervisory position," "[o]n multiple occasions . . . failed to submit the proper paperwork for subcontractors to get paid," brought his child to jobsites, left jobsites during work hours, and "allow[ed] his subcontractors to sleep in customer homes." (Dkt. 57-1 at 242; *accord* Dkt. 56-1 at 219 (declaration of Mr. Delgado stating the same).) Mr. Parra similarly testified that "on a few occasions" he

- 14 -

discovered Plaintiff was absent from his jobsites. (Dkt. 56-1 at 105.)   Finally, Mr.

Parra, Mr. Cerrillo, and Mr. Delgado all testified that Plaintiff's personal issues

negatively affected his work performance. (*See* Dkt. 56-1 at 110–12, 124, 164, 180–81,

213.)   Accordingly, Defendants have satisfied their burden to produce legitimate,

nondiscriminatory reasons for their actions. *Compare Jordan v. Warehouse Servs., Inc.*,

81 F. Supp. 2d 1257, 1270–71 (M.D. Ala. 2000) (determining that the defendant had

"satisfie[d] its exceedingly light burden" on this front by offering evidence that the

plaintiff was terminated for violating company rules without a valid explanation

(quotation omitted)), *with Turnes*, 36 F.3d at 1062 (determining that the defendant had

failed to satisfy its burden only because it "came forward with no explanation" as to

why it had refused to hire the plaintiff).

    To survive summary judgment under *McDonnell Douglas*, Plaintiff must now

show that these reasons were a pretext for discrimination. *See Lewis*, 918 F.3d at 1221.

That said, Plaintiff need not rely on *McDonnell Douglas*. *See Tynes*, 88 F.4th at 946.  He

may instead attempt to show a "convincing mosaic of circumstantial evidence that

would allow a jury to infer intentional discrimination by the decisionmaker." *Id.*

(quotation omitted).  However, the pretext analysis under *McDonnell Douglas* and the

convincing mosaic approach are both "just the ordinary summary judgment

standard." *McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024).   The

question is whether Plaintiff has adduced "enough evidence for a reasonable jury to

conclude that illegal discrimination occurred." *Id.* at 1326; *accord Ossmann v. Meredith*

*Corp.*, 82 F.4th 1007, 1020 (11th Cir. 2023) (explaining that "the convincing mosaic inquiry" and the pretext "stage of the *McDonnell Douglas* framework . . . both ask whether there is enough evidence for a reasonable jury to infer intentional discrimination"). Plaintiff must show "not only that [Defendants'] justification[s] w[ere] pretextual, but that the real reason for the employment action[s] was [race] discrimination." *Tynes*, 88 F.4th at 944; *see Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981) (noting that once the defendant offers legitimate, nondiscriminatory reasons for its actions, the plaintiff "must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision," which "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination"); *Jolibois v. Fla. Int'l Univ. Bd. of Trs.*, 654 F. App'x 461, 464 (11th Cir. 2016) ("A plaintiff's showing that an employer's proffered reason is unpersuasive does not necessarily establish that the plaintiff's proffered reason is correct; a district court must still conclude that the employer's real reason was impermissible." (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993))).

"The plaintiff can establish pretext by showing that the employer's non[]discriminatory reason should not be believed, or, when considering all the evidence, that it is more likely that the discriminatory reasons motivated the decision than the employer's proffered reasons." *Lawver v. Hillcrest Hospice, Inc.*, 300 F. App'x 768, 772 (11th Cir. 2008). "When an employer asserts misconduct by an employee as the legitimate reason for its action, the pretext inquiry focuses on the employer's beliefs and whether the employer was dissatisfied with the employee for nondiscriminatory

reasons, 'even if mistakenly or unfairly so.'" *Siddiqui v. NetJets Aviation, Inc.*, 773 F. App'x 562, 564 (11th Cir. 2019) (quoting *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)); *see Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that the inquiry is not whether the employee was actually guilty of misconduct but whether the employer in good faith believed so and whether this belief was the reason for the termination).

Plaintiff first argues that Mr. Parra's failure to explain why Plaintiff was fired at the time of his termination is alone sufficient to demonstrate that Defendants' proffered reasons are pretextual. (Dkt. 57 at 7.) Plaintiff cites two cases to support this proposition, (*id.*), both of which are non-binding and distinguishable. In *Mock v. Bell Helicopter Textron, Inc.*, the court determined that a genuine dispute existed as to whether the reasons given for terminating the plaintiff were pretextual because when he was fired, the plaintiff "insisted that [the defendant] give him the reason for its decision," which the defendant refused to do. 196 F. App'x 773, 774 (11th Cir. 2006). Here, however, Plaintiff testified that he asked Mr. Parra why he was being fired and then left after Mr. Parra told him that the decision came "from the office." (Dkt. 57-1 at 47.) In *Reilly v. Duval County Public Schools*, the court only looked to the defendant's refusal to share with the plaintiff the reason for her termination as one factor among many. No. 3:04-CV-1320-J-32MMH, 2006 WL 3130918, at *8–9 (M.D. Fla. Oct. 31, 2006). The plaintiff in *Reilly* had significant evidence of pretext over and above this refusal, including the decisionmaker's statements that the plaintiff's age was an implicit factor in his decision. *Id.* at *8 (considering statements such as "[i]t's time for

you [(the plaintiff)] to retire," "[y]ou need rest," "[y]ou've worked long enough," and "[i]t's time for you to stay home"). The record does not demonstrate that Mr. Parra refused to explain why Plaintiff was being fired nor that Plaintiff demanded a reason for his termination, and thus, Plaintiff's argument is unavailing. (*See* Dkt. 57-1 at 47, 107.)

Plaintiff also argues that Defendants have offered inconsistent reasons for terminating Plaintiff, stating alternatively that Plaintiff's termination was "due to performance issues with houses on his route" and "because of allegedly receiving reports from its largest customer that Plaintiff brought his child to construction sites." (Dkt. 57 at 7.) While pretext can be established by "demonstrating . . . inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action," *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1274 (11th Cir. 2017) (quotation omitted), these reasons are not inconsistent—indeed, as Defendants argue, they are complementary. While Defendants note in their motion that they received reports that Plaintiff brought his child to jobsites, it is clear from their motion that they perceive this behavior as emblematic of Plaintiff's personal issues more broadly, which Defendants explicitly link to Plaintiff's performance issues. (*See* Dkt. 56 at 7, 10–12.) They reiterate this argument in their reply. (Dkt. 61 at 8–9 (noting that Defendants have consistently asserted that "[Plaintiff]'s personal problems caused job performance problems").) The record supports this assertion. For example, Mr. Parra noted in the employee disciplinary form that Plaintiff demonstrated "carelessness" and a "[l]ack of attention" and that he "brought his personal problems

to work." (Dkt. 56-1 at 257.) Similarly, he testified that Plaintiff's personal problems interfered with his work, as did Mr. Delgado. (*See id.* at 110, 213.)

Mr. Cerrillo, who testified both that he was fond of Plaintiff and that Plaintiff was generally a good employee, also noted that Plaintiff's personal issues affected his work performance. (*See id.* at 164 ("[Plaintiff] always had to run. Always had to go take care of something, and it came to a point where it was . . . becoming overwhelming and I would tell him . . . keep your family issues to yourself."); *id.* at 173 ("[Plaintiff] did his job pretty well. Yes, he had a lot of personal issues that . . . at times interfered, but always found himself to get back on track. He . . . is my friend. It's just sad that I got to speak . . . to you guys about these truths."); *id.* at 181 ("[Plaintiff] told everybody about his problems. To the point . . . I told him . . . you're bringing the morale down . . . don't come with the negativity all the time.").) *Compare Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1324 (11th Cir. 2023) (determining that the plaintiff had shown pretext where she asserted that she had not engaged in the conduct that defendant relied upon in firing her), *with Smith v. Thomasville Ga.*, 753 F. App'x 675, 696 (11th Cir. 2018) (disregarding a plaintiff's pretext arguments because he did not rebut evidence that he was fired for poor performance but sought instead merely to "'quarrel[] with the wisdom' of the defendants' decision" (quoting *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc))). Indeed, Mr. Cerrillo testified that he believed Plaintiff was not qualified for a promotion because his "personal problems got in his way, way more than he thought." (Dkt. 56-1 at 168.) Mr. Cerrillo further testified that there were times when he simply dismissed Plaintiff for the day

because it was clear from Plaintiff's demeanor that "he would[ not] be able to perform properly" given his personal issues. (Dkt. 56-1 at 187.) Similarly, Plaintiff testified that he openly disagreed with Mr. Parra prior to his suspension. (*See* Dkt. 57-1 at 37 ("When I came back to work, . . . Mr. Parra blamed me for [problems that Christian was not able to handle] and I told him that it really was[ not] my responsibility, it was your responsibility to help Christian to make sure that he did everything correctly, and I guess he got upset because we had the conversation in front of other supervisors . . . .").) Defendants' citing both Plaintiff's work performance and personal issues does not demonstrate pretext.

Plaintiff next argues that the reasons proffered by Defendants are meritless. (Dkt. 57 at 8–9.) He disputes that he brought his child to jobsites, (*id.* at 8), but apparently does not dispute that he was occasionally absent from jobsites during work hours, (*see id. passim*; Dkt. 56-1 at 143, 219; Dkt. 57-1 at 242; *see also* Dkt. 56-1 at 164 (Mr. Cerrillo's testimony that he had to discipline Plaintiff because of "his timing," recalling that he had given Plaintiff both verbal and written reprimands for "having to leave and take care of his own personal issues")). Nor does Plaintiff appear to contest that he failed to stop workers he was supervising from sleeping on the job, (*see* Dkt. 56-1 at 124, 219, 257; Dkt. 57-1 at 242), which Mr. Parra noted in Plaintiff's May 11, 2023 disciplinary form "[Plaintiff] was told about," (Dkt. 56-1 at 257). Similarly, Plaintiff does not respond to Mr. Parra's contention that he "never d[id] his weekly report on time." (*Id.*; *see id.* at 123–24, 218 ("[Plaintiff] routinely did not submit subcontractor documents within the two-week time window allowed . . . . [Plaintiff]'s

failure to timely complete and submit paperwork from subcontractors negatively impacted [Vatos]'s relationship with its subcontractors . . . .").)

Instead of addressing these specific claims regarding his work performance, Plaintiff maintains that Mr. Parra "admit[ed] that he wanted to terminate Plaintiff and was actively searching for something to use as justification." (Dkt. 57 at 8.) Plaintiff cites Mr. Parra's testimony that he was considering terminating Plaintiff "because there were just too many issues happening" and that he requested documentation pertaining to Plaintiff's employment history in June 2022. (Dkt. 57-1 at 90.) It is unclear how these citations demonstrate pretext. Mr. Parra testified that he believed he had a basis for terminating Plaintiff—"there were just too many issues happening"—and sought to review Plaintiff's disciplinary history to substantiate his position before he presented it to Luis Rodriguez. (*See id.* at 90–91 ("One of my responsibilities was to justify the acts and justify why things were done. . . . I was sure about what I had. I was just asking for . . . some more. . . . You don't fire anyone unless you have the why.").) *See Rodriguez v. Orlando Sun Resort & Spa, LLC*, No. 6:08-cv-2117-Orl-22KRS, 2010 WL 11507692, at *7 (M.D. Fla. Apr. 26, 2010) (disregarding testimony that a supervisor was "trying to get rid of [the plaintiff]" as "too vague to support a finding of pretext").

Plaintiff also cites letters from three builders' supervisors he worked with to show that they believed he was a good worker,[3] (*see* Dkt.57-1 at 238–39), as well as

---

[3] Defendants argue that the court cannot consider these letters because they are inadmissible hearsay. (Dkt. 61 at 9.) However, the court "may consider a hearsay statement if it can be reduced to admissible

Mr. Cerrillo's testimony that some complaints he received regarding Plaintiff proved
to be false, (*id.* at 123).  This evidence does not contradict Defendants' assertions
regarding Plaintiff's work performance.  While these individual supervisors apparently
had a positive view of Plaintiff's performance, their statements do not demonstrate
that Defendants' reasons were pretextual.  *See E.E.O.C. v. Total Sys. Servs., Inc.*, 221
F.3d 1171, 1176 (11th Cir. 2000) (explaining that the "inquiry is not whether [an]
employee [i]s guilty of misconduct but whether [the] employer in good faith believed
[the] employee had done wrong and whether this belief was the reason for the
termination" (citing *Elrod*, 939 F.2d at 1470)).  Plaintiff does not, for example, argue
that Defendants were aware of these positive reviews.  (*See* Dkt. 57.)  *See Alvarez*, 610
F.3d at 1266 ("The inquiry into pretext centers on the employer's beliefs, not the
employee's beliefs and, to be blunt about it, not on reality as it exists outside of the
decision[]maker's head.").  Regardless, even disregarding Mr. Parra's testimony that
he had received verbal complaints about Plaintiff from other builders' supervisors,
(Dkt. 56-1 at 113), Mr. Parra testified that he had also received complaints from
subcontractors regarding Plaintiff's work, (*see* Dkt. 57-1 at 101–03).  Plaintiff cannot
substitute his business judgment in weighing these competing appraisals of Plaintiff's
performance—the subcontractors' and the builders'—for Defendants', nor may the

---

evidence at trial." *Buckley v. Sec'y of the Army*, 97 F.4th 784, 788 n.4 (11th Cir. 2024).  Defendants do
not argue that these emails could not be so reduced at trial—by, for example, calling the declarants
who drafted the emails to testify—and thus, the court will consider them.  *See Jones v. UPS Ground
Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) ("The most obvious way that hearsay testimony can be
reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial.").

court follow him in doing so. *See Chapman*, 229 F.3d at 1030; *Alvarez*, 610 F.3d at 1266
("[A federal court] does not sit as a super-personnel department, and it is not [the
court's] role to second-guess the wisdom of an employer's business decisions—indeed
the wisdom of them is irrelevant—as long as those decisions were not made with a
discriminatory motive." (quotation omitted)).

Plaintiff himself concedes that at least some of the homes he supervised suffered
from quality issues, though he argues that these issues were caused by the
subcontractors Mr. Parra sent him. (*See* Dkt. 56-1 at 52–53 (stating that one
subcontractor did not finish houses on time or return to correct work after Plaintiff
advised him of issues).) Mr. Parra noted that some of the subcontractors he chose did
poor work routinely but that he was forced to continue to work with them for want of
alternatives. (*See* Dkt. 57-1 at 99–101.) Plaintiff cannot ask the court to insinuate itself
into a dispute as to who was to blame for the issues present in Plaintiff's homes. *See*
*Chapman*, 229 F.3d at 1030 ("Provided that the proffered reason is one that might
motivate a reasonable employer, an employee must meet that reason head on and
rebut it, and the employee cannot succeed by simply quarreling with the wisdom of
that reason."); *Alvarez*, 610 F.3d at 1266 ("The question is whether [the plaintiff's]
employers were dissatisfied with [the plaintiff] for . . . non[]discriminatory reasons,
even if mistakenly or unfairly so . . . .").

More pertinent to the court's task is Plaintiff's assertion that Mr. Parra "did not
criticize or discipline [Plaintiff's] Hispanic counterparts," who, Plaintiff contends,
struggled in the same ways that he did. (Dkt. 57 at 9.) However, the record citations

appearing after this assertion do not support it. (*See id.* (citing, for example, Dkt. 57-1 at 15–18, 63–66, 99–104, 114–16).) From the court's own review of the record, the only evidence that arguably supports this assertion is Plaintiff's conclusory statements that all his Hispanic coworkers were treated better than he was. (*See, e.g.*, Dkt. 57-1 at 24 ("[Mr. Parra] was treating me differently [from] the rest of the supervisors in the office and it wasn't right and I didn't agree with it."); *id.* at 43 ("I just felt like I was singled out. None of the other guys were getting treated like I was treated").) While "[a] convincing mosaic may include evidence that similarly situated employees were treated differently, even where those employees were not strict comparators at the prima facie stage of a *McDonnell Douglas* analysis," the plaintiff must still offer some factual comparison between himself and those others who he claims were treated differently. *Robert v. City of Boca Raton*, No. 21-13779, 2024 WL 3066604, at *5 (11th Cir. June 20, 2024); *compare id.* ("[W]e conclude [that the plaintiff's proffered comparators] were simply too dissimilar. Their one-off performance issues reasonably distinguish them from [the plaintiff]'s repeated paperwork errors."), *with Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022) (considering evidence that a specific, named individual, though "not a strict comparator," "threatened his supervisor . . . [but] did not incur any additional warnings or discussion about his comments"). Plaintiff's vague references to "Hispanic counterparts" that were treated better are insufficient. *See Jones v. Spherion Atl. Enter., LLC*, 493 F. App'x 6, 9 (11th Cir. 2012) (determining that the plaintiff's statements that her supervisor "rudely reprimanded [black women] for violations[] while ignoring the same violations of white women even after the white

- 24 -

women's violations were pointed out to him" and "singled out black women" were "conclusory . . . and contain[ed] no specific details," and so "f[ell] short of creating a genuine issue of material fact"); *see also Jolibois*, 654 F. App'x at 464 ("[C]onclusory allegations of discrimination, without more, are insufficient to show pretext.") (citing *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996)).

Plaintiff claims that "Defendants' failure to follow [their] flexible procedures is also evidence of pretext." (Dkt. 57 at 9.) While flexible policies "introduce[] subjectivity into employment decisions" and are therefore "looked upon . . . with increased scrutiny," Plaintiff must still show that the flexible policy was applied discriminatorily. *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) (discerning pretext where the plaintiff showed that the defendants were "willing to bend" and even "to break . . . the rules" for specific white employees to the detriment of the plaintiff, who was black). The mere "fact that an employer's decision was subjective, or that it was based on an unwritten or informal policy subject to differing interpretations, without more, does not show that it was pretextual." *Dent v. Ga. Power Co.*, 522 F. App'x 560, 563 (11th Cir. 2013).

Plaintiff points to a number of purported inconsistencies in sworn statements by Defendants' witnesses, though it is not clear how, if at all, these inconsistencies support his argument that Defendants' reasons for revoking his bonus, suspending him, and terminating him were pretextual or that Defendants' actions were discriminatory. (Dkt. 57 at 9–11.) For example, he argues that Mr. Parra contradicted himself with regard to whether Defendants use bonus reductions or suspensions as disciplinary

measures and that Mr. Parra purportedly could not recall whether Plaintiff had been suspended "while also testifying about Plaintiff's suspension." (Dkt. 57 at 9–10 (citing Dkt. 57-1 at 75–76, 81–82).) It is not clear how this contradiction demonstrates pretext, but in any event, these discrepancies are seemingly explained by Vatos's lack of a formal disciplinary process. Mr. Delgado testified that Vatos did not have "a documented outline of the procedure to follow" but rather "assess[ed] each case . . . on an individual basis." (Dkt. 57-1 at 146.) He also clearly testified that bonus reductions or revocations and suspensions without pay were both forms of discipline that Vatos employed. (*See id.* at 146–47.) Indeed, Mr. Parra testified that he had his bonus revoked "several times" "[b]ecause of his failures." (*Id.* at 92.) Even if Plaintiff had shown that Defendants violated a policy or process in disciplining him, "[a] breach of an internal policy alone does not amount to a showing of pretext." *Jolibois*, 654 F. App'x at 464.

The same is true of the balance of Plaintiff's proffered evidence of discrepancies—including that "the suspension document was not provided to Plaintiff," that Mr. Parra did not appear to get Luis Rodriguez's permission to suspend Plaintiff, that Mr. Delgado appeared to delegate the responsibility to investigate Plaintiff's complaint to Mr. Parra and Luis Rodriguez, and that "[Mr.] Delgado testified that Johanna Cabrera did not have any involvement in the discussion [regarding Plaintiff's termination] but then admit[ted] that she was tasked with pulling Plaintiff's files," (Dkt. 57 at 10–11). Once again, the mere fact that an employer violated their internal procedures is insufficient to survive summary judgment. *See*

- 26 -

*Jolibois*, 654 F. App'x at 464; *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007) (discerning no evidence of pretext where the defendant hired an individual "without the internal posting of the position required by [the defendant's] corporate policy" because "violat[ion] [of] corporate personnel policies . . . does not necessarily indicate racial discrimination."); *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995) ("The mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual.").

Even if Plaintiff had shown that Defendants' reasons were pretextual, he needed to adduce sufficient evidence from which a reasonable juror could infer that racial discrimination animated Defendants' adverse employment actions. *See Burdine*, 450 U.S. at 256; *Tynes*, 88 F.4th at 944. The record evidence before the court does not permit such an inference.

In this vein, Plaintiff relies on the demographics of Defendants' employees, arguing that they "engaged in systematic racial discrimination . . . , including discriminatory hiring practices," apparently because most of their employees were Hispanic while only two were black. (Dkt. 57 at 13; Dkt. 57-1 at 179–81.) While statistics may be helpful in demonstrating discriminatory intent, "statistical evidence is unreliable where the company only employs a small number of employees." *E.E.O.C. v. H.S. Camp & Sons, Inc.*, 542 F. Supp. 411, 443 (M.D. Fla. 1982). "While there is no numerical cutoff point for statistical significance, the smaller the sample

size, the greater the likelihood that the underrepresentation reflects chance rather than discriminatory practices." *Williams v. Tallahassee Motors, Inc.*, 607 F.2d 689, 693 (5th Cir. 1979); *see id.* (explaining that a "small number of females" was found "less probative in [a] company of only [ninety] employees"). Accordingly, because Defendants only employed between fifty and fifty-five people, statistical evidence is unreliable. (Dkt. 56-1 at 223.)

Plaintiff also fails to acknowledge whether Defendants may be hiring from a predominately Hispanic labor pool, as well as any differences in interest in Defendants' line of work within and without Plaintiff's protected class. *See H.S. Camp & Sons*, 542 F. Supp. at 443 ("The interest or disinterest of certain members of the relevant labor pool in applying for a job with the employer should be considered in determining the proper evidentiary weight to be accorded to the statistical analysis."). In the absence of any analysis as to the demographic information provided, the court does not find that it constitutes evidence of intentional racial discrimination on the part of Defendants.

Plaintiff also testified that a coworker informed him that "Mr. Parra was saying that Luis Rodriguez wanted him to keep applying pressure on [Plaintiff] because they wanted [him] to quit," (Dkt. 57-1 at 40), which he argues "confirm[ed] the discriminatory animus." (Dkt. 57 at 5.) Plaintiff admitted, however, that while "it seemed" to him "like they were just trying to get rid of the black person," he could not say why they were trying to get him to quit. (*Id.* ("But I wouldn't know why, you know. It appeared to me and I can't speak factual, I can only say to me, it seemed like

they were just trying to get rid of the black person there."); *see also id.* at 130 ("[Is] it just that he ([Mr. Parra]) hates black people because it seemed like they just wanted Spanish-speaking people up in there.").)    Plaintiff's subjective belief that race motivated Defendant's alleged desire to pressure him to quit is insufficient to create a genuine dispute of fact.  *See United States v. Stein*, 769 F. App'x 828, 832 (11th Cir. 2019) (disregarding the plaintiff's statements because they "conveyed her subjective belief, not personal knowledge," and because "[b]elief, no matter how sincere, is not equivalent to knowledge" (quotation omitted)).  Indeed, courts in this district have found statements such as these to affirmatively undercut allegations of discrimination. *See Huchzermeyer v. AT&T Commc'ns*, 746 F. Supp. 99, 103–04 (N.D. Ga. 1990) (reasoning that because "the plaintiff openly admit[ted] in his deposition that his suit [wa]s based completely on conjecture," "it [wa]s obvious that the plaintiff c[ould ]not establish that age played a substantial role in the defendant's failure to rehire him"); *Maholanyi v. Safetouch of Tampa, Inc.*, No. 3:14-cv-1161-J-32JRK, 2016 WL 3595743, at *6 (M.D. Fla. July 5, 2016) (determining that the plaintiff's deposition testimony that "he did not know why he was terminated, but age discrimination was 'an assumption' and 'the best [he] could come up with on why this happened,'" cut against his discrimination claim).

Plaintiff also restates his argument that Defendants treated similarly situated individuals outside of his protected class better, stating that they "consistently provided [Plaintiff's] Hispanic counterparts more favorable assignments including better subcontractors and/or lenience with deadlines due to the frequent subcontractor

delays." (Dkt. 57 at 14.)  The record citations Plaintiff relies upon, however, do not support his argument.  (*See id.* at 13–14 (citing Dkt. 57-1 at 15–18, 35–37, 45–47, 63–66, 70–71, 80, 99–104, 107, 114–16, 125–27, 142–43, 194–99).)  *See Jones*, 493 F. App'x at 9; *Jolibois*, 654 F. App'x at 464.

Finally, Plaintiff points to comments allegedly made by Mr. Parra, Luis Rodriguez, and other unidentified superiors.  (Dkt. 57 at 2, 12–14.)  Plaintiff testified that Mr. Parra, who is originally from Venezuela, (Dkt. 56-1 at 95), said that "in Venezuela when they see a black person walking, they will cross to the other side because they'd be scared that the black person is gonna rob them."  (Dkt. 57-1 at 11.) Plaintiff further testified that Mr. Parra, Luis Rodriguez, and "some of the other people that were higher up" said that "black people [do not] do drywall."  (Dkt. 57-1 at 12–13.)  Racial remarks can be considered as circumstantial evidence in an employment discrimination case.  *See Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291–92 (11th Cir. 1998) (concluding that the district court erred in disregarding a comment from the plaintiff's supervisor that he had "never seen as many blacks in this building except in a Tarzan movie" "as an 'isolated general racial remark,'" because that comment constituted circumstantial evidence of race discrimination); *Rojas*, 285 F.3d at 1342–43 (11th Cir. 2002) (reasoning that comments indicating a gender bias "can *contribute* to a circumstantial case for pretext").  However, stray comments unrelated to the adverse employment action at issue, absent more, are insufficient to survive summary judgment.  *See id.* at 1343 ("Because [the comment allegedly made by the plaintiff's supervisor] was (looking at the admissible evidence before the district court) an

- 30 -

isolated comment, unrelated to the decision to fire [the plaintiff], it, alone, is insufficient to establish a material fact on pretext."); *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228–29 (11th Cir. 2002) ("Although a comment [that '[w]e'll burn his black ass'] unrelated to a termination decision may *contribute* to a circumstantial case for pretext, it usually will not be sufficient absent some additional evidence supporting a finding of pretext." (internal citation omitted)).

Here, there is no indication that these comments were connected to Defendants' challenged employment decisions. Moreover, there is no indication that these comments were made around the time Plaintiff was disciplined, as Plaintiff could not recall when they were made. (*See* Dkt. 57-1 at 11–12.) Indeed, Plaintiff testified that Mr. Rodriguez's comment had been made "[y]ears before." (*See id.* at 13.) In the absence of any connection to the adverse employment actions, temporal or otherwise, these statements are insufficient, on their own, to establish pretext. *See Floyd v. Fed Exp. Corp.*, 423 F. App'x 924, 932 (11th Cir. 2011) (reasoning that a comment allegedly made by the plaintiff's supervisor, that he "[wa]s 'getting rid of all the blacks,'" "[wa]s non-probative [of pretext]," in part, "because it [wa]s too remote from the decision to terminate [the plaintiff]"); *Robertson v. All Am. Quality Foods, Inc.*, 246 F. Supp. 3d 1365, 1375 n.7 (N.D. Ga. 2017) ("[I]solated discriminatory remarks that are not made in temporal or other connection with a challenged employment decision and proximate in time to the employment actions at issue are not viewed as probative of discriminatory animus."); *Maholanyi*, 2016 WL 3595743, at *6 (determining that a decisionmaker's statements, including that he "may just have to replace [the plaintiff's]

- 31 -

old ass with someone younger and faster," did not support a finding of pretext because "there [wa]s no evidence that they were made in relation to the decision to terminate [the plaintiff]" (citing *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003))). Because Plaintiff has offered no other circumstantial evidence of race discrimination, these comments are insufficient, on their own, to survive summary judgment.

Because a reasonable juror could not infer that Defendants' decisions to revoke Plaintiff's bonus, suspend him, or terminate him were motivated by race discrimination, Defendants' motion is granted as to Counts I and III.

## B.  Disability Discrimination

A prima facie case of discrimination under the ADA requires the plaintiff to show that he (1) "had a disability," (2) "was a qualified individual," and (3) "was subjected to unlawful discrimination because of h[is] disability."  *Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018).  Defendants contend that they cannot have committed disability discrimination because they had no knowledge of Plaintiff's disability.  (Dkt. 56 at 21.)  "[I]t is evident that an employee cannot be fired 'because of' a disability unless the decisionmaker ha[d] *actual* knowledge of the disability." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185 (11th Cir. 2005)); *see Howard v. Steris Corp.*, 550 F. App'x 748, 751 (11th Cir. 2013) (affirming grant of summary judgment to defendant as to the plaintiff's discrimination claim under the ADA and disregarding the plaintiff's argument that "the decisionmakers had constructive notice of his sleep disorder" because "discrimination is about actual knowledge, and real intent, not

constructive knowledge and assumed intent" (cleaned up) (quoting *Cordoba*, 419 F.3d at 1183)).

Defendants assert that the only knowledge they had regarding Plaintiff's purported disability was his June 20, 2022 doctor's note, which stated only that Plaintiff would be out for a week without explanation.  (*See* Dkt. 57-1 at 236.)  Moreover, the note indicated merely that Plaintiff had visited UF Health Family Medicine and thus provided no information concerning the specific ailments Plaintiff may have suffered.  (*See id.*)  Plaintiff argues, however, that he also "communicate[d] with [Mr. Parra] about his condition," citing Mr. Parra's testimony.  (Dkt. 57 at 17 (citing Dkt. 57-1 at 88–89).)  Mr. Parra testified that Plaintiff provided him with his doctor's note and that Plaintiff had advised Mr. Parra that his doctor "recommend[ed] that he take . . . a day or two off because of his blood pressure or something related to his nerves."  (Dkt. 57-1 at 88–89.)  These statements from Plaintiff were not sufficient to put Defendants on notice that Plaintiff was disabled within the meaning of the ADA.  *See Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir. 1996) (affirming grant of summary judgment as to a plaintiff's ADA claim where she did not "inform[] any of the employees of Broward County of her specific disability," reasoning that "[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA"); *Howard v. Steris Corp.*, 886 F. Supp. 2d 1279, 1292 (M.D. Ala. 2012) ("[A]n employee has to tell his employer about his specific disability before the ADA triggers an obligation to . . . refrain from hiring him because of the disability."); *McCarroll v. Somerby of Mobile, LLC*, No. 12-

0709-CG-M, 2014 WL 517406, at *3 (S.D. Ala. Feb. 6, 2014) (determining that a plaintiff's evidence of the defendant's knowledge of his disability was insufficient where the plaintiff generically complained of "back pain" to a superior without "offer[ing] any details about the substance of that conversation" such that it "[wa]s not clear that anything [Plaintiff] said then should have put [the superior] on notice that his back problem was a persistent disability within the meaning of the ADA rather than a one-time complaint").

Accordingly, Defendants' motion is granted as to Count V.

## C. Retaliation

"Retaliation against an employee who engages in statutorily protected activity is barred under both Title VII and [section] 1981." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257–58 (11th Cir. 2012) (citing 42 U.S.C. § 2000e-3(a), and *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008)). Similarly, "[t]he ADA prohibits retaliation against an individual for opposing an unlawful practice or making a charge under the ADA." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (citing 42 U.S.C. § 12203(a)). *McDonnell Douglas*'s burden-shifting framework applies to retaliation claims. *See Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009) (Title VII and section 1981); *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021) (ADA).[4] To establish a prima facie case of retaliation under any of these laws, a

---

[4] While a plaintiff may survive summary judgment as to retaliation claims by showing a convincing mosaic of circumstantial evidence that would allow a jury to infer retaliation, *see Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307, 1310–11 (11th Cir. 2023); *Davidson v. Chspsc LLC*, 861 F. App'x

plaintiff must show that (1) he "engaged in statutorily protected activity," (2) he "suffered a materially adverse action," and (3) "there was a causal connection between the protected activity and the adverse action." *Chapter 7 Tr.*, 683 F.3d at 1258 (quotation omitted); *see Frazier-White*, 818 F.3d at 1258 (applying the same standard to a retaliation claim arising under the ADA). The court first considers the retaliation claim under Title VII and then turns to the ADA claim.

### 1. Title VII

Defendants contend that Plaintiff's retaliation claims must fail because he did not engage in protected activity. (*See* Dkt. 56 at 13–18.) They argue that the only complaint Plaintiff made, the email he sent on May 23, 2022, following his suspension, was not protected activity because it did not reference discrimination based on Plaintiff's race. (*Id.* at 13–14.) Plaintiff testified that this email was the only written complaint he made regarding this sort of behavior. (*See* Dkt. 56-1 at 60.)

In the email, Plaintiff briefly described the events leading up to his suspension—his taking the day off on May 20, 2022, delegating his responsibilities to a coworker, and Mr. Parra's subsequent determination that Plaintiff had acted improperly—before reporting his belief that he was being "singled out," that Mr. Parra was incompetent, that Plaintiff had been "passed over three times for upper management positions," that he felt he "ha[d] been disrespected," that Mr. Parra "play[ed] favor[ites] with certain workers," and that he "d[id] not deserve to be treated in this manner." (Dkt. 56-1 at

---

306, 311 (11th Cir. 2021), Plaintiff does not raise a convincing mosaic argument as to his retaliation claims, (*see* Dkt. 57 at 17–18).

265.)  Plaintiff does not, however, assert that this purported disparate treatment was

because of his race.  *Compare Garrett v. R.E. Michel Co.*, No. 8:20-cv-1391-CEH-SPF,

2021 WL 5506810, at *6 (M.D. Fla. Nov. 24, 2021) (determining that the plaintiff's

complaints "that he was being treated less fairly than his white coworkers and that he

was suspended because of his race" constituted protected activity), *with Jeronimus v.

Polk Cnty. Opportunity Council, Inc.*, 145 F. App'x 319, 326 (11th Cir. 2005) (concluding

that sending an email in which the plaintiff "complained of being 'singled out,' being

subjected to 'a campaign of harassment,' and working in a 'hostile environment,'" did

not constitute protected activity because the plaintiff "never suggested that this

treatment was in any way related to his race or sex"), *and Holiness v. Moore-Handley,

Inc.*, 114 F. Supp. 2d 1176, 1185 (N.D. Ala. 1999) (discerning no protected activity

where the plaintiff merely complained "about an alleged disparity in pay" without

"voic[ing] to anyone . . . that his race was the reason that he was not being paid what"

he had been promised or otherwise "inject[ing] the element of race into his

complaints"), *and Wells v. Mia. Dade County*, No. 15-22431-Civ-COOKE/TORRES,

2016 WL 7492560, at *6 n.8 (S.D. Fla. Dec. 30, 2016) (determining that the plaintiff

had not engaged in protected activity where she merely complained "that she had

'been treated unfairly by [a manager]' without explaining why she thought he was

mistreating her"); *see also Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir.

2006) ("Merely complaining in general terms of discrimination or harassment, without

indicating a connection to a protected class or providing facts sufficient to create that

inference, is insufficient."); *Benavides v. Ga. Pub. Def. Council*, No. 2:19-CV-00281-SCJ-

JCF, 2021 WL 2448360, at *8 (N.D. Ga. Jan. 14, 2021) (collecting cases), *report and recommendation adopted by* 2021 WL 2447517 (N.D. Ga. Feb. 3, 2021).

In his response, Plaintiff appears to concede that his email did not constitute protected activity, asserting that "Defendants' focus on whether Plaintiff provided written complaints is irrelevant as verbal complaints can also constitute protected activity." (Dkt. 57 at 18 (citing *Evey v. Creative Door & Millwork, LLC*, No. 2:15-cv-441-FtM-29MRM, 2016 WL 1321597, at *3 (M.D. Fla. Apr. 5, 2016) (concluding for a retaliation claim brought under the FLSA that an oral complaint can constitute protected activity)).) Accordingly, he appears to implicitly accept Defendants' argument that his email did not constitute protected activity. Regardless, the court is persuaded that Plaintiff's email did not constitute protected activity, especially in the absence of any argument to the contrary. (*See* Dkt. 57.)

Plaintiff maintains that he "engaged in protected activity when he escalated concerns of racial discrimination," (*id.* at 18), but this statement is not supported by any citations to the record. (*See id.*) Plaintiff may be referring to his testimony that he told Luis Rodriguez that Mr. Parra "d[id not] like [him]" and "was treating [him] differently [from] the rest of the supervisors." (Dkt. 57-1 at 23–24.) He may also be alluding to Mr. Cerrillo's testimony that Mr. Cerrillo was "pretty sure" Plaintiff had complained to him that Plaintiff had not been promoted based on his race. (Dkt. 57-1 at 135.) Mr. Cerrillo also testified that Plaintiff would "throw it out there" that he was "being racially profiled," though he did not provide any context as to these statements. (*Id.*)

Even assuming that these verbal statements constitute protected activity, Plaintiff's causation argument centers on the "significant temporal proximity between Plaintiff's protected activity" and the revocation of his bonus, his suspension, and his termination. (Dkt. 57 at 18.)[5]  However, there is no indication as to when the above-cited comments to Mr. Cerrillo were made, and his statements to Luis Rodriguez were made in December 2021.  (*See* Dkt. 57-1 at 20–24.)  The period of time between these statements and the first adverse employment action at issue—the revocation of Plaintiff's bonus—is more than four months, so the temporal proximity is insufficient to establish causation.  *See Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 507 F.3d 1306, 1317 (11th Cir. 2007) (concluding that a four and one-half month gap was too long to establish causation); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (concluding that a three month gap, without more, was too long).  For these reasons, Plaintiff's Title VII retaliation claim fails.

## 2. ADA

As to ADA retaliation, Plaintiff states that he "engaged in protected activity when he . . . requested reasonable accommodations of a brief medical leave."  (Dkt. 57 at 18.)  This statement apparently refers to the doctor's note Plaintiff emailed Mr. Delgado and Mr. Parra on June 20, 2022, which merely reported that Plaintiff "was

---

[5] Plaintiff also mentions, without elaboration, "the glaring inconsistencies and departure from procedure surrounding" these adverse actions.  (Dkt. 57 at 18.)  As the court explains above in connection with racial pretext, any such inconsistencies and procedural peculiarities stem from the many ways in which Plaintiff allegedly allowed his personal issues to interfere with his work, as well as the nature of Defendants' business structure, which Mr. Delgado conceded was informal.  (*See* Dkt. 57-1 at 146.)

seen" by a doctor's office on that date and that he could "return to work as of [June 27, 2022]."  (Dkt. 57-1 at 235–36.)

A request for a reasonable accommodation constitutes protected activity under the ADA.  *See Hughes v. Wal-Mart Stores E., LP*, 846 F. App'x 854, 858 (11th Cir. 2021) ("An employee participates in a protected activity when she makes 'a request for a reasonable accommodation.'" (quoting *Frazier-White*, 818 F.3d at 1258)). Nevertheless, Plaintiff's email did not constitute protected activity because it was a unilateral assertion that Plaintiff would be absent from work for one week for an indeterminate reason, not a request for an accommodation.  This conclusion follows from the fact that "the duty to provide a reasonable accommodation is not triggered unless a *specific demand for an accommodation has been made*."  *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) (emphasis added); *see Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1188 (10th Cir. 2016) ("Although the notice or request does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' it nonetheless must make clear that the employee wants assistance for his or her disability." (quotation omitted)); *Williamson v. Clarke Cnty. Dep't of Hum. Res.*, 834 F. Supp. 2d 1310, 1320 (S.D. Ala. 2011) ("What, then, is an 'adequate request' [for an accommodation]?  Case authorities are legion for the proposition that, at a minimum, the employee must request some change or adjustment in the workplace *and* must link that request to his disability, rather than simply presenting the request in a vacuum.").  Accordingly, Plaintiff's retaliation claim under the ADA fails, too.  *Compare Moran v. Wegmans Food Mkts., Inc.*, 65 F. Supp. 3d

327, 332 (W.D.N.Y. 2014) (determining that the plaintiff had not adequately alleged he had engaged in protected activity where he had merely faxed the defendant a doctor's note "stating that [he] would be absent from work for three days" because the fax was not a "request for an accommodation," nor indeed "a 'request' for anything," and "[the defendant] had no opportunity to grant or deny [the plaintiff] time off as an accommodation"), *and Benson v. Westchester Med. Ctr.*, No. 20-CV-05076 (PMH), 2022 WL 2702544, at *14 (S.D.N.Y. July 12, 2022) (finding *Moran*'s "logic . . . persuasive" and applying it), *with Smith v. Swift Transp. Co. of Ariz., LLC*, No. 1:20-CV-05091-VMC-JEM, 2022 WL 19562385, at *3, 11 (N.D. Ga. Dec. 19, 2022) (determining that the plaintiff's submission of a doctor's note constituted protected activity because "[t]he information in the note, including that [the p]laintiff was under Dr. Kurl's care for chronic hypertension, was sufficient to notify [the d]efendant of [the p]laintiff's disability and desire to work remotely"), *report and recommendation adopted by* 2023 WL 3019012 (Mar. 16, 2023).

Even if Plaintiff had established a prima facie case of retaliation under either Title VII or the ADA, he would also have had to demonstrate that the legitimate, nondiscriminatory reasons proffered by Defendants were a pretext for retaliation.  *See Bryant*, 575 F.3d at 1307; *Todd*, 998 F.3d at 1219.  As discussed above, Plaintiff has failed to do so.  Accordingly, Plaintiff's retaliation claims fail as a matter of law, and summary judgment is granted to Defendants as to Counts II, IV, and VI.

### D.  Interference

FMLA interference claims generally involve an "assert[ion] that [the plaintiff's] employer denied or otherwise interfered with his substantive rights under the [FMLA]." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). "However, the protections of the FMLA only apply if the plaintiff is an aggrieved 'eligible employee.'" *Cowman v. Northland Hearing Ctrs., Inc.*, 628 F. App'x 669, 671 (11th Cir. 2015). An "eligible employee" under the FMLA does not include "any employee of an employer who is employed at a worksite at which such employer employs less than [fifty] employees if the total number of employees employed by that employer within [seventy-five] miles of that worksite is less than [fifty]." *Id.* (quoting 29 U.S.C. § 2611(2)(B)(ii)). "Thus, in order for the FMLA to apply, the 'employer(s) at issue must have at least [fifty] employees within a [seventy-five] mile radius of the worksite.'" *Id.* (quoting *Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1254 (11th Cir. 2004)).

Defendants submit that "Vatos at all relevant times employed fewer than [fifty] employees within [seventy-five] miles of [Plaintiff]'s worksite." (Dkt. 56 at 21–22.) They rely upon Mr. Delgado's declaration that Defendants "employed less than [ten] employees in Jacksonville, and the remainder of the employees were more than [seventy-five] miles away in Orlando and Tampa." (Dkt. 56-1 at 223.) Plaintiff counters by pointing to Mr. Delgado's testimony that Defendants did have the requisite number of employees and that Plaintiff was eligible under the FMLA. (*See* Dkt. 57-1 at 169–70 ("Q: And so does the company have the requisite amount of employees within the specific range that qualifies them as an employer that would

have to provide FMLA, as far as you know?  A: Yeah.  We had close to [fifty] at the time, so yes.").)  However, in that same deposition, Mr. Delgado expressly testified that Defendants only employed "six to seven" employees in Jacksonville from 2021 to 2022, with the balance of Defendants' employees in Orlando and Tampa.  (Dkt. 61 at 74.)  From the record evidence presented, there is no genuine dispute that Defendants employed fewer than fifty employees in Jacksonville.  Because the rest of Defendants' employees were in Orlando and Tampa, each of which is more than seventy-five miles away from Jacksonville,[6] Plaintiff was not an eligible employee under the FMLA.  *See Cowman*, 628 F. App'x at 671 (affirming the district court's determination that the plaintiff was not an eligible employee because "the uncontroverted evidence established that her employer . . . employed fewer than [fifty] individuals within [seventy-five] miles of her worksite").

Plaintiff contends that the court must disregard Mr. Delgado's statements under the sham affidavit rule.  (Dkt. 57 at 15.)  *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").  Mr. Delgado's

---

[6] Plaintiff does not appear to dispute that Jacksonville is more than seventy-five miles away from Orlando and Tampa.  (*See* Dkt. 57 at 15.)  Nevertheless, the court takes judicial notice of it.  *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

statements do not create one of those "rare situation[s]" in which the sham affidavit
rule applies. *Clay v. Equityexperts.org, LLC*, No. 1:21-cv-02540-LMM-JEM, 2024 WL
2164647, at *2 (N.D. Ga. Mar. 26, 2024). While Mr. Delgado opined that Defendants
employed sufficient employees to qualify them under the FMLA—a legal conclusion
that the court disregards, *see Bucklew v. Charter Commc'ns, Inc.*, No. 8:19-cv-2029-TPB-
AAS, 2021 WL 1250772, at *2 (M.D. Fla. Apr. 5, 2021)—he expressly stated that
there were only six or seven employees in Jacksonville. (*See* Dkt. 61 at 74.) Mr.
Delgado's statement that Defendants had "close to [fifty] [employees] at the time"
does not contradict his other statements that only six or seven of those employees were
in Jacksonville. (*Compare* Dkt. 57-1 at 169, *with* Dkt. 56-1 at 222–23, *and* Dkt. 61 at
74.) Accordingly, the court does not disregard Mr. Delgado's statements under the
sham affidavit rule.

Because Plaintiff was not an eligible employee, Defendants' motion is granted
as to the FMLA claim.

## CONCLUSION

The Eleventh Circuit has "repeatedly and emphatically held that a defendant
may terminate an employee for a good reason or bad reason without violating federal
law." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).
Federal courts "are not in the business of adjudging whether employment decisions
are prudent or fair," but rather "whether unlawful discriminatory animus motivates a
challenged employment decision." *Id.* Because there is not sufficient "evidence on

which the jury could reasonably find for [Plaintiff]," Defendants are entitled to summary judgment. *Weaver*, 169 F.3d at 1321.

Accordingly:

1. Defendants' motion (Dkt. 56) is **GRANTED**.

2. The Clerk is **DIRECTED** to enter judgment in favor of Defendants, to terminate any pending motions and deadlines, and to close this case.

**ORDERED** in Orlando, Florida, on May 23, 2025.

_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record